May it please the Court, good morning, Your Honors. My name is Jamie Marquardt, and I represent the appellant, Sofa Entertainment, and my apologies if my voice is weak, I've been sick a little bit, but I'll try to project. The primary issue on this appeal is, like the previous case, whether there's anything protectable in value in a mere isolated seven-second-long clip of Ed Sullivan's iconic introduction of the Four Seasons on his show, or is it that the clip's mere short length alone prevents it from being protectable or automatically subjects it to a fair use defense? Every single event in the Jersey Boys' play is portrayed by actors, except for one. Mr. Sullivan's introduction of the Four Seasons on his show is the only one that's just re-broadcast. So, actors portrayed every other role, and fictional sets substituted for pictorials of actual places and times. The entire dialogue and the plot were all fictionalized, though loosely based on history. And only Mr. Sullivan's performance, the original copyrighted performance recorded in the 60s, his iconic introduction, was performed to the audience as is. Screen came down, showed it, that's it. So, why would the clip be merely played back in isolation, in no transformative way whatsoever? Certainly, impersonators and actors, as they did the Four Seasons, could have portrayed Mr. Sullivan, could have easily depicted the performance or the introduction of the Four Seasons in an appropriate way. But the reason why they, the creators of the play, chose not to do that is, to me, obvious. Nothing could compare to the quality and the genuineness of that simple, second introduction. That was Mr. Sullivan's performance. It was not like the Elvis Presley case that has been mentioned many times and did involve my client. It was not a performance by Elvis or by the Four Seasons. It was Mr. Sullivan's performance. It was a small performance. And we don't say, as the court tended to get us wrong in thinking that we were saying, that our performance or Mr. Sullivan's performance of this mere seven seconds makes the play. We're not even saying that it's that important to the larger scheme of things in the play. What we are saying, though, is that it has some value. Maybe not more than what a scale actor would have gotten, minimum scale for portraying him. That's still some value. And someone chose not to pay an actor. They chose to play this. Excuse me. The Elvis Presley case talks about using these kinds of things as historical reference points. And isn't that precisely how the Ed Sullivan clip was used here, as an historical reference point? Your Honor, I think earlier in one of the cases, perhaps the one that preceded one of you on the panel, wisely mentioned that transformative in that sense is a very slippery slope. The fact that the clip fits in the play, that it's historical or biopic, and that it naturally makes some sense with things that are before it and after it, as Your Honor on the panel that mentioned the Everett Munch blow-up doll. But in the same way that you mentioned that, the playing of that clip does not become transformative merely because it fits in the play. Yes, but it's an historical reference point. And we seem to suggest in our cases that that's okay. The Bill Graham case is much like that, too, out of the Second Circuit, where they were using Grateful Dead posters as references to Grateful Dead. And that was also held to be transformative. It seems to me that this is similar in those two cases. Well, Your Honor, I can take your point. And I agree it may be similar in some respects, but it wasn't necessary at all to the portrayal of these events. And the historic reference could have simply been accomplished by using an impersonator. Well, is necessary a component of that? I mean, the Bill Graham case, they didn't have to include the posters. That didn't. True. So the fact that, I mean, not so much today perhaps, but there was a time when Ed Sullivan may have been the most impersonated figure in the country. Wouldn't it have been hard for someone to have portrayed that? So in that sense, it wasn't necessary. But I'm not sure that makes – that undermines the possibility of it being a fair use. I don't believe that necessary is a requirement at all. In fact, I believe the opposite. And that's our argument, that it wasn't necessary at all. But it was chosen to be played. And the reason why that's important is this is a fictionalized for-profit endeavor. This is not a historical documentary as was the Elvis documentary. This is a fictionalized play for entertainment purposes. Someone decided to just play the clip. Nothing else. The fact that it's only seven seconds long does not make it transformative. Doesn't context play a role here? It does, though that's where I would hearken back to the slippery slope that was mentioned before. Everything that is – every small portion of work that's claimed to be copyrighted, like this one, will always be put in context. It's a two-hour-long play. We don't dispute that. Of course things happen before and after it that put it in context. The point is the impact of this clip was important to the creators of this play, and they didn't transform it in any way. I'll reserve more time. You may do so, Counsel. We'll hear from the other side. Good morning, Your Honors. My name is David Korzenek of Miller-Korzenek-Sommers, and I appear on behalf of the two defendants, Dodger Theatricals and Dodger Productions. It's a wonderful, fair use day. I wish my class could be here. But the most notable thing about what the plaintiff is saying here is basically, in their brief, and even in this argument here, when they use words like for-profit, fictionalized, entertainment, this is a studied effort at conscious avoidance of what it is that the Campbell v. Acuff-Rhodes case did in transforming and giving more clarity and certainty to fair use analysis. It did a number of things that the plaintiff and many plaintiffs tried to do, and that is to go back to the pre-Acuff-Rhodes cases, take statements out of them like Sony, HarperCollins, and use them in a way that Acuff-Rhodes and Justice Souter and Acuff-Rhodes said we should not do. So the first thing that Acuff-Rhodes worked on fair use analysis was to substantially reduce the importance of the commercial use canard. I use that phrase because the commercial use canard is actually Judge LaValle's term in a lecture that he gave about the history of fair use analysis at the UCLA NIMRA lecture. Fair use is not as fuzzy or unclear as it once was pre-Acuff-Rhodes. The first thing that happened was is that the whole idea that commercial use militates against fair use may still to some small degree but far, far less, and here's what happened. The court observes there that if by commercial use, and by the way commercial use is a very fuzzy kind of term. That's the fuzzy term, not fair use analysis. Usually people use the word commercial use in order to try to suppress or diminish First Amendment-type protections, and as we know from Elvis and from Acuff-Rhodes and so on, the fair use doctrine is essentially a stand-in for the First Amendment within copyright law that ensures that copyright law will be First Amendment compliant, that makes sure that copyright law will be First Amendment kosher. Now the first thing that, so let's assume that commercial by commercial, he means for profit, a phrase that he used. The court says that the fact that a defendant drew profit from their work is largely irrelevant to fair use. Here's what Acuff says. If indeed commerciality carried presumptive force against a finding of fairness, the presumption would swallow nearly all of the illustrative uses listed in 107, including news reporting, criticism, I won't give you the list, since these activities are generally conducted for profit in this country. Another thing that Acuff did in terms of crunching down on the significance of profit is that it observed, and this is the most significant line from it, is that the more a new work is transformative, the less it matters if the use is commercial, and specifically the court said the more transformative the defendant's new work, the less will be the significance of other factors, like commercialism, that may weigh against a finding of fair use. And it did another thing in terms of how it crunched down on the significance of commercialism and boosted the importance of the transformative characteristic of the use. It said that when it comes to the analysis of the fourth factor, which other courts like the Second Circuit pre-Acuff-Rose, because you've got to be careful of the pre-Acuff-Rose cases, because plaintiffs love to cite them, but some of them are off mark. What they say is that the fourth factor is not the most important factor anymore, not post-Acuff-Rose. Instead, the court says that transformative uses or earnings from transformative uses cannot be counted toward market impact or market harm. Specifically, Acuff says, when the defendant's use is transformative, then the market substitution is at least less certain and market harm may not be so readily inferred. Indeed, again, with transformative, in that case it was parity, there are different literary and artistic conventions that qualify as transformative. It's more likely that the new work will not affect the market for the original in a way that is cognizable under this factor, namely factors. Which leads us to the question of why is this second clip transformative? It's transformative actually in a fairly powerful way and quite accepted way. There are several different types of conventions of transformative use that are accepted. The court tells us in the tradition of fair use analysis, courts have to be open to a wide range of potential new transformative uses, beautiful line of Holmes in Campbell to that effect. Here we do something that's pretty classical. We use it for a brief historical reference. What's very interesting about it, which heightens and gives it a direct commentary, is that the event that we're depicting is one of great significance in cultural history. It's about the time of the British invasion. In fact, in our play, what happens is before this six-second frame is played, the gaudio actor steps forward and becomes a narrator. He goes through what they call the fourth wall, and he speaks to the audience. He says, and this goes directly to its commentary and effort to put it in historical context, which Judge Gee makes special note of, he says, around this time there was a little dust-up called the British invasion. Britannia's ruling the airwaves, so we start our own American revolution. The battle begins on Sunday night at 8 o'clock, and the whole world is watching. So that's the first comment. It's the Gettysburg revolution. You have your antagonists and your protagonists, and this is the pivot point. That's the pivot point. By the way, this moment is a crucial moment in history because in cultural history we have the British invasion. You have the American groups are completely knocked back. The American cultural rock genre is knocked over by them, and now they come back that night on Ed Sullivan to fight the Beatles off on the turf that they had first landed. But Ed Sullivan is the icon for this very, very point, and I think that's what counsel is making. Perfect word.  Icon means that a certain word or an event, and it's interesting because plaintiffs love to say that their picture or their video or whatever is iconic. Well, that's precisely the basis on which we draw it. Judge Kaczynski has a great comment in a really teachable case, the Barbie Girl song case, and he notes that when a particular event or name becomes part of the cultural argo, becomes part of the cultural language, it becomes all the more susceptible to comment, all the more deserving of comment by others, and this is precisely that kind of moment. This thing rose to an important cultural importance, to a greater cultural importance for American cultural history. It's somewhat analogous to what happens when Scotch tape becomes a generic term. It no longer applies to the brand, but it becomes a thing, or frigid air becomes a refrigerator. I guess it can in that sense. I mean, that's true. It's similar to what Judge Kaczynski was talking about. I guess in part, but he was also trying to say that there was a First Amendment expressive dimension to it that gets heightened, and he just says, look, you want to talk about this being commercial in some sense. It seems to me that the Elvis Presley case is one of your better cases because it talks in terms of biographical markers and historical sign points and all the rest, and that seems to cover this pretty directly. It does, and in fact, one of the reasons that, Your Honor, that we say that the position that they're taking is objectively unreasonable and unfair to us is because they already had a tutorial on the fair usability of Ed Sullivan clips in other people's works. In the other case, which the Ninth Circuit called a close call, at least as to the issue on the injunction, they used about 35% of Elvis Presley's performances on Ed Sullivan. Now, we just used that introduction in order to highlight that particular thing. What's interesting is he's trying to say that because it's entertainment, it's somehow less susceptible. Well, pretty much every single fair use case relates to entertainment. Just look, A Cup Roses is a bawdy rap song. The Leibovitz case in the Second Circuit is an advertisement for a comedy movie. The BGA case, the Bill Graham Archives case, historical but it's a coffee table book about the Grateful Dead. The Mattel case is Barbie rock song. The Lennon case is use of a song in a movie. Most, you know, I could go on and on. The Saturday Night Live, I Love New York, and so on. All of these things are entertainment, but the fact that they're entertainment doesn't rob them of the ability to be fair uses. In fact, those are the classic ones. So, to say entertainment, for profit, you somehow are less entitled to fair use is wrong. And it reflects an effort to look away from the reality of what A Cup Roses really did here. And plaintiffs love also to tell you that, I say you, but to me when they're making a claim against a fair use, is that, well, you know, fair use is kind of fuzzy. Well, it used to be much more fuzzy than it is now. With this ordering of analysis and the way that transformative use is supposed to inform and sometimes drive the other factors and sometimes reduce their importance, A Cup Roses really has given more strength and clarity to the fair use defense. And I think that we clearly are eligible and correct in the way in which this work was used. I should just note then that after the clip and the group does this performance, Gaudio steps forward again and now comments on that particular event and its importance. He says, we were in a social movement like the Beatles. And again, it's a commentary on the time. Our fans didn't put flowers in their hair and try to levitate the Pentagon. I won't read the whole thing. But you can see, again, it's trying to comment on that cultural moment. It's doing what historical references do all the time. Now, Your Honor points to the Elvis case, and it's completely correct. In the Elvis case, though they used far, far more, as I said, 35% of his performances, there are several lines from it that just tell you directly that what we did here is okay. The court says, here, Passport's use, used many of the television clips, is transformative because they're cited as historical reference points in the life of a remarkable entertainer. Elsewhere, it says, the footage is of such significance that it can properly be characterized as newsworthy events. The fact that these appearances have already been broadcast on TV also weighs in Passport's favors. These things are half a century old and, therefore, all the more historically important. While using a small number of clips to reference an event for biographical purposes seems fair, using a clip over and over, as they did in the other case, was not. We did not use it over and over. We didn't refer to it in our advertising. We didn't use it in our advertising. We didn't use any music. We didn't use any performance. It was just for that reference. And there's a final point that I think is, in a certain sense, inappropriate and unfair in terms of what the plaintiff has done here. In the Elvis case, we go to this issue about the heart. Well, of course, as Acuff-Rose points out, the heart canard is, if you're making fair use of something, you would, of course, use that part of it that is most known and representative. And Acuff-Rose points that out. So the point to the fact that someone uses the heart is what parody and comment is most likely to use. Now, what's interesting here is that when they were before this court, in the Elvis case, they told this court that the most important thing that they license is the music, the performances of those actors. And now what they're doing is they're coming to this court and saying, oh, but the most important thing, the heart, wasn't the performances, as we told you back in the Elvis case. The most important thing is actually Ed Sullivan coming forward and introducing it. Is it in the record in this case what they said to us in the Elvis case? No, only in the Elvis case itself. It seems that the court accepted that argument that they offered. But I don't know. I was not privy to that and not involved in that litigation. There's different contexts, different importance. I mean, what's important about Ed Sullivan and the Ed Sullivan show as a icon isn't the actual performance. You didn't show the actual performance as part of the play. It was Ed Sullivan. And the most important thing about Ed Sullivan was his... His persona. His unique way of introducing acts and appearing on the Ed Sullivan show was itself a significant milestone in somebody's career. But it was the Ed Sullivan piece that made it significant. Of course, if it wasn't significant, we wouldn't use it. In other words, that's the paradox of the whole thing. And that's what A.F. Rose recognizes, that you're going to use things that matter. I'm kind of wondering if this clip were used... in a variety of different contexts. Let's say in the 70s, as opposed to very recently, it would be hard to say that has an historic context. Here, you're relying on the historic feature, are you not? We are. It seems to me that if he had the right for his image 40 years ago, when did he lose it? Maybe that's my question. Two things I want to say about this. One, they are really making a right of publicity argument that we're using his image, his persona. Well, this is not a right of publicity case. I don't even think they own Ed Sullivan's persona. He's dead. He's a New York person. His domicile is in New York, so he has no post-mortem privacy rights, and no such claim could be made. That's what they're really pointing to. But then again, are we permitted to use it? Of course we should be able to use it. It's an important moment in history. Now, Your Honor's point about the passage of time is an interesting one, though I suspect that one could still make more contemporary references to Ed Sullivan in important and transformative ways that were perhaps non-historical. That could be critical, or that even could be putting his British invasion into perspective, because when you think about it, his show was the battlefield on which that British invasion took place and the place which the American bands fought back, and this was the courageous moment that the Four Seasons tried to take back with the ground that they had lost, because all their songs were now falling into second and third place to the British. I don't think it was a great marketing gimmick for both. That's right. It may have been. I'll make another point that I just think is kind of an interesting one. If a work goes to the issue of profit, the work is, you know, in theater, special feature here, four out of five plays fail. Four out of five plays lose money. And when you decide about what you're going to do and what rights you'll clear and what you won't, you don't know if you're going to succeed or fail. Could it possibly be, and I'm sure that Acove Rose doesn't look at this factor, that if you fail, it's fair use, but if you succeed, it's not. Okay. Can't be that. Before your time expires, do you want to say something about the Attorney Fee Award? You heard the discussion in the last case. I'm troubled by what our standard of review is at this point and how much deference are we required to give. Well, I'm going to let my colleague Walt Sadler address that, with your honors. Thank you. Good morning, Your Honor. Walt Sadler for defendants. It's an abusive discretion standard. I think everybody agrees on that. And there's an interesting case that just came down from the Ninth Circuit. It's for publication, Mattel v. MGA Entertainment, which involves the same. Counsel, do the same thing we, as I mentioned earlier, distribute copies of that citation to the court and to opposing counsel. Okay. And it's Mattel case. It's just an opinion at this point. I don't have the site. But it discusses the appropriateness of fees in the standard. But that's all I really have to say, is that it is an abusive discretion standard, and the court didn't abuse their discretion. Why was it objectively unreasonable to bring this lawsuit? Well, that's one of the things that the Mattel case points out, is that that's not even a factor anymore. This court says, Mattel argues that because the claim was objectively reasonable, MGA is not entitled to fees. This argument seeks to resurrect the long-rejected arguments of frivolousness and bad faith that were made in the Apple Computer v. Microsoft case. So it wasn't objectively reasonable, even if that was the standard, because I think the Elvis case makes clear that this court admonished them that they were right on the edge, and this was a much stronger case than Elvis, which the court pointed out was a close case. All right. Thank you, counsel. Oh, sorry, question. Usually when I have a copyright case, I try to read or watch the work. I see from the record that a copy was submitted to the district court, but when we checked, so I guess it's technically part of the record, but when we checked, it's not there anymore. Does anybody know the state of the record with regard to the copy of the performance? Well, the district court mentioned that they saw it on the record, and it was a DVD that was submitted in compliance with all electronic filing requirements, which believe me, that was a pain in the neck to get it down there, but we did. Where is it now? That's the question. It should still be in the district court. We were kind of wondering about that. I asked the clerk when we looked and couldn't find it. The district court says it was returned to the parties. And if you could submit, like, three, because we're in different cities, if you want us to see the performance, that's all we can do. Should we submit it directly to you? To the clerk of court. They'll circulate it. Yeah. Thank you. Thank you.  Mr. Marker, do you have a question? No, I don't. Okay. Richard, you have some reserve time. Yes, I do. And would you mind addressing the attorney fee issue as well? Now, as I recall, SOFA was part of the Elvis Presley litigation and suffered attorney fees there as well, did it not? SOFA won that case. Oh, I'm sorry. All right, all right. It was merely called a close case. Okay. And I would take from His Honor's characterization of the issue of transformativeness, which I'd like to start with first, it is abuse of discretion, it is objectively unreasonable, and I submit that we haven't been objectively unreasonable, certainly when filed. But more to Your Honor's point, I think the more appropriate case than Elvis Presley is actually three cases. It involved L.A.'s own unsavory Gettysburg of the day, the beating of Reginald Benny. And there were three cases. I think maybe all three were in front of Florence Marie Cooper, but certainly she decided two of them that differed. And in the KCAL TV case, which if you ask me which one is most important to me, I'll tell you that one is. In the KCAL TV case, there was a news program. They were merely showing the clip of Reginald Benny being beaten as an introduction to a news program, not even a commercial use of it, I mean a newsworthy historical program. And they even had a voiceover, I believe, introducing it. But the mere fact that it was a historical reference of importance, that it was something that needed to be referenced to cover the story, was not enough to make even this small clip transformative. What did make it transformative was when the same clip was used as part of a real montage, which if we're arguing whether it's a montage or not, perhaps there is room for the district court still to decide. But there is no montage in this instance.  The clip was, instead of being played as an introduction, it was the same clip but it was part of a montage. It was actually transformed, actually edited. For goodness sakes. This was not even edited here. And I respectfully submit that that's a more appropriate case than the Elvis Presley case. But more importantly, that it can't be right. It can't be, to juxtapose the phrase, fair at all, that instead of paying an actor a few hundred dollars per play, they were merely allowed to just play a clip of Mr. Sullivan's performance for free. Just can't be. And as far as the attorney's fees go, the reason I circle back to the transformative question, which I think is the most important one, not whether it's commercial or any of that, the reason I circle back to that is, as difficult as this question was, even for the court, some factors in our favor, some factors not, as difficult as that was by the time we had a full record, the objective unreasonableness is measured from the time of filing. And as hard a case as this may or may not be, it makes it even more difficult, even under an abusive discretion standard, to say that when we filed our actions, that we were objectively unreasonable. Now, the Mattel case has taken objectively or announced that past cases have taken that out, and so I'm adrift in the same way that Judge O'Scanlan referred to. Frankly, I can't figure out what the standard is today, and I understand abusive discretion review in the district court, presumably the district court has to apply some standard.  My understanding, I can almost define it by what it's not. Start with the Mattel case. There is a history of that. We know, as Judge Kosinski did say in the Mattel case, I'm very familiar with it, he mentioned that to argue that essentially a frivolousness requirement, like a Rule 11 requirement, is meant by objectively unreasonable, has already been decided by many cases. And I agree. That's true. But the court also recognized that it's something less than frivolous, but doesn't have to be, if it's not brought in bad faith, which the court actually found that our case was not brought in bad faith, there's still some possibility of it being objectively unreasonable. And, I mean, to me, what that means, I think what you draw from is the summary judgment standard itself, but you're applying it, not whether summary judgment was appropriate at the end of the day, you're applying essentially a motion to dismiss standard, because you're talking about contemporaneously, at the time that the action was filed, was it objectively unreasonable, which means, by its own definition, that at the time filed there was no reasonable, objective, good faith basis for bringing the suit. And we submit that there clearly was. We believe we were right all along. Anything further, counsel? No. If not, thank you very much. Thank you, Your Honor. The case just argued will be submitted for decision.
judges: O'scannlain, Trott, Clifton